Defendant issued to plaintiff a life insurance policy wherein it agreed to pay him $25 per month during his lifetime should he become "wholly and presumably permanently disabled before the age of sixty, subject to all the terms and conditions contained in Section One" of the policy. Section One, so far as germane to the issues herein, reads as follows, to-wit:
"Disability shall be deemed to be total whenever the Insured is wholly disabled by bodily injury or disease so that he is prevented thereby from engaging in any occupation whatsoever for remuneration or profit.
"Disability shall be presumed to be permanent, — (a) Whenever the Insured will presumably be so totally disabled for life; or — (b) After the Insured has been so totally disabled for not less than three consecutive months immediately preceding receipt of proof thereof.
"* * * if at any time it shall appear to the Company that the Insured is able to engage in any occupation for remuneration or profit, no further income payments shall be made nor premiums waived."
In June, 1931, plaintiff became wholly incapacitated to perform any sort of work and in compliance with the policy provisions, defendant then began paying him monthly disability benefits. These continued with little interruption until May, 1939, at which time payments were discontinued without reason therefor being assigned. After amicable demand for resumption of said payments and refusal, this suit followed.
Plaintiff alleges that he is now totally, wholly and permanently disabled and has been in this condition without interruption since 1931, and thereby he is prevented from earning a livelihood or pursuing any gainful occupation. He sues to recover monthly payments of disability benefits, also the penalty and attorneys' fee provided for by Act 310 of 1910, on the theory that defendant's action in discontinuing payments was unjust, unreasonable and arbitrary.
Defendant resists the suit on the ground that plaintiff is not now nor has he been since May, 1939, totally and wholly disabled within the provisions of the policy contract.
There was judgment for plaintiff in keeping with his demand. His attorneys' fee for services in the lower court was fixed at $150. Defendant prosecutes appeal. Answering the appeal, plaintiff prays for increase in the quantum of attorneys' fee to $250, the full amount sued for.
In June, 1931, an unusually severe type of arthritis developed in plaintiff's knees, ankles and left hip. He was confined to bed therefrom for eleven months, a goodly part of which time was spent in hospitals. The hip joint became immobile from ankylosis and a successful operation was performed to relieve its impairment. This occurred in the year 1934, and confined plaintiff to bed for three and one-half months. The left leg, as a result of the operation, is one and one-half (1 1/2) inches shorter than the right.
After plaintiff's recovery from the operation and his ailments had been alleviated as much as medical science and surgery could do, these conditions remained and are present today, to-wit:
Right knee and both ankles are so stiff from ankylosis as to materially impair flexion; also, ability to move the feet in any direction is materially impaired. Callouses have developed in both feet. The left leg is atrophied from above the knee to the toes.
Since June, 1931, plaintiff has been under the observation of Dr. T.J. Smith, a reputable physician in Shreveport, who has regularly treated his ailments. He knows and is in a position to know plaintiff's condition better than any one else, and gave the following testimony which, considered in connection with the above described pathological conditions, is enlightening, to-wit:
"Q. All right, an occupation that calls for being on your feet for substantially an *Page 920 
eight hour day, day in and day out. Under those conditions would you say he has a disability? A. He is certainly disabled insofar as being on his feet is concerned. I just made the comment that if he is on his feet all day I am sure he has discomfort, because I have seen him along and he has come to me along because of swelling in his feet, and because of these callouses bothering him, and the mechanics in his lower extremities are not good, as I have stated. He does not walk straight up and down on his legs. They are bearing outward and his knees inward, which throws an angle on his joints, which, of course, is not comfortable. You cannot put an abnormal angle on a joint in walking. I should say that he is disabled, insofar as being on his feet is concerned, to a marked degree.
"Q. Can there be any substantial improvement? A. Of course, his improvement has reached the maximum point quite some time back. That is, in about 1935 or 1936; possibly before that. There is always a chance of increased disability in a case like his, with age. That would not be immediate but gradual. In an older person, as you know, the joints are not as flexible, even under normal conditions, as in a young person. I should say his disability might increase with age. That would depend on weight and a lot of things. Generally, I should say it might be expected to increase."
The correctness of the conclusions and opinion of Dr. Smith is not contradicted by any witness in the case. Dr. Kerlin, who testified for defendant, does not dissent therefrom, but, on the contrary, substantially agrees with Dr. Smith.
Plaintiff's father has operated a small florist shop in the City of Shreveport for many years. After completing a high school course, plaintiff began working in his father's shop and in 1931, when he first became disabled, was performing the duties of designer. That was his occupation at the time. He acquired the knowledge, skill and ability needful to fill that position from practical experience and observation in his father's business and by attending elsewhere short courses in designing.
The duties of a designer in a small florist shop are somewhat numerous besides that of designing, and making up wreaths, sprays and other forms of floral decorations. It includes the handling of heavy objects. Perforce such duties are performed almost entirely while standing up. Much bending of the body forward over a wide table is required in assembling material preparatory to and in the confection of large wreaths, etc., for funerals, marriages, and other public affairs. It is not unusual that such a designer has to be on the job for long hours and sometimes all night in order to fill heavy rush orders.
Plaintiff is now thirty-six years of age. He is married and has one child. He did nothing in the way of work to engage his mental and physical faculties from June, 1931, until he reentered his father's business some time during the year 1935. He did this on his father's advice. The father, after stating that plaintiff stayed at his home and was doing nothing but twiddling his thumbs, testified: "* * * I saw that his mental condition was being rapidly deteriorated on the strength of it. He was fretting and stewing * * * So he has come down to the shop since that time and, when his leg don't hurt him much, he does what I would say would be a minor part down there whenever the necessity arises."
Plaintiff does no designing and is unable to do so. His father has a designer regularly employed. Plaintiff answers phone calls, assists in sending out monthly statements and when there is a rush of business or help is short, he waits on customers who desire to make small purchases. He is paid no salary, but has access to the cash drawer of his father's business. If he stands on his feet for as much as forty-five minutes, his legs and ankles swell badly. He is forced, in order to have relief, to bathe them in hot water and to massage them. Following such experiences he invariably lies down on a cot, there provided for his special use, until the swelling subsides. He is unable to walk for more than a block or two without his legs, ankles and feet swelling and becoming very discomforting.
In this court defendant does not seriously contend that plaintiff's present physical ailments do not prevent him from successfully performing the duties of a designer. It does argue seriously that the lower court erred in holding that plaintiff, a young man, "who could perform the duties of a salesman, from a physical, mental and educational viewpoint, was prevented from engaging in any occupation whatever for remuneration and profit." *Page 921 
It seems clear to us that a disability which prevents one from acting as a designer will also render him incapable of performing the duties of a salesman. In each instance it is indispensable that the employee regularly work while on his feet, and it is definitely shown that plaintiff can do no work efficiently which requires him to be on his feet regularly.
Because plaintiff does odd jobs in his father's business, more for mental and physical recreation than for remuneration, should not militate against his contentions. What other florist would give him employment at a salary to perform the light miscellaneous duties he now performs? If his father's business should cease, where would he be? It is safe to say he could not procure employment as a designer, a salesman, a clerk or anything else worthwhile.
The law applicable to cases of this character, wherein the provisions of the insurance contract are the same or are in substance the same as those in the policy before us, is well established by decisions of the Supreme Court and the Courts of Appeal of this state.
Defendant cites and relies upon many cases decided by the federal courts and courts of other states. These cases may, in whole or part, lend comfort to defendant's position, but they are not controlling here in view of our own jurisprudence on the subject.
It is a well recognized canon of construction that provisions in life, health and accident policies of the sort under consideration, should be given a liberal rather than a strict interpretation to the end that equity be done and the underlying beneficent purposes of the contract not be rendered nugatory.
To come within the quoted provisions of the policy, it is not necessary that the insured be in a state of complete physical helplessness. If his physical ailments prevent him from doing "substantially all the material acts necessary to the prosecution of his business or occupation in substantially his customary and usual manner", this is sufficient to entitle him to recover. It can be said without fear of contradiction that plaintiff's physical impairment does prevent him from substantially, and in the customary manner, performing the duties of his regular occupation and also those of any other occupation which would require him to be regularly upon his feet.
The comparatively recent cases of Boughton v. Mutual Life Insurance Company of New York, 183 La. 908, 165 So. 140, and Crowe v. Equitable Life Assurance Society of United States,179 La. 444, 152 So. 52, are decisive of the principal issue in the instant case.
In the Crowe case the court quoted approvingly from and largely based its decision upon the rule laid down in Couch on Insurance, and in Ruling Case Law. The rule as stated in R.C.L., Volume 14, page 1315, § 491, reads as follows: "Accident policies usually provide for periodical indemnity for `total disability', or what is usually considered its equivalent, for injuries disabling the insured from transacting any of the duties pertaining to his occupation. Total disability is necessarily a relative matter, and must depend chiefly on the peculiar circumstances of each case. It must depend largely upon the occupation and employment and the capabilities of the person injured. The rule prevailing in most jurisdictions is that the `total disability' contemplated by an accident insurance policy does not mean, as its literal construction would require, a state of absolute helplessness which can result only from loss of reason, since as long as one is in full possession of his mental faculties he is capable of transacting some part of his business, whatever it may be, although he is incapable of physical action. On the contrary, these courts, giving consideration to the object of the contract, hold that the `total disability' contemplated by the agreement is inability to do substantially all of the material acts necessary to the prosecution of the insured's business or occupation in substantially his customary and usual manner."
The rule is supported by the weight of authority in England as well as in the United States.
The holding in the Crowe case is reaffirmed in the Boughton case. The court, as reflected from the syllabus in the Boughton case, held: "Insured who underwent appendectomy operation resulting in post-operative hernia, and who was disabled from performing duties with respect to managing large farm held `totally and permanently disabled' within life policy providing for total and permanent disability *Page 922 
benefits, notwithstanding insured managed farm through medium of tenant farmers and assistance of his relatives."
This case is not as strong from plaintiff's standpoint as is the present one. Boughton, at the time he brought suit, was able to a material extent to perform his former duties as overseer and operator of a large cotton plantation. Plaintiff, in the case at bar, is wholly unable to perform the duties of his former occupation. The provisions of the policy in the Boughton case are virtually identical with those of the policy with which we are now dealing.
As regards the demand to recover statutory penalty and attorneys' fee, we quote with approval the findings of fact of the trial judge and his conclusions thereon, and adopt them as our own:
"Plaintiff was regularly examined by physicians for the defendant. Plaintiff was visited by inspectors on behalf of the defendant, and, the one who testified in the case, visited the plaintiff at the store of plaintiff's father, on September 18, 1937, and January 21, 1938. Plaintiff was examined by Dr. Fleming on February 15, 1938, and a report made to the company, which is filed in evidence. (Dr. Fleming was sick at the time of the trial and could not attend as a witness.) It appears that there has been no change in the physical condition of the plaintiff since 1937."
* * * * *
"* * there has been no attempt on the part of plaintiff to conceal from defendant the nature and extent of the activities of himself throughout the whole period — and yet the defendant with all of the information before them continued to pay for total and permanent disability under the provisions of the policy."
* * * * *
"As before stated, there is nothing in the record to indicate a change in the condition of plaintiff. The defendant has brought forth nothing on which they could say that they acted in good faith in discontinuing payments. The inspector who testified in the case saw plaintiff in 1937 and January 1938, but on his reports the defendant continued to make payments to plaintiff. If any other inspector or any other examination was made between 1938 and May 1939, when payments were discontinued, on which defendant relied as a cause for discontinuing payment, it was not produced by the defendant; therefore, we are bound to conclude that there was no additional information furnished; hence, we have a case which in effect the defendant says: `I recognize my liability under the existing facts (as I have paid you for two years) but now I quit without giving any reason for so doing'.
"It appears that the penalty for failure to continue making the monthly payments as provided by Act 310 of 1910 must be assessed, since the record is barren of evidence of a reason for discontinuance of the monthly payments. It is not contended that the payments from 1937 to May 1939 were made in error; therefore, without a change for the better in the condition of plaintiff, the action of defendant in discontinuing the payments must be considered unreasonable and arbitrary. Had this controversy arisen at the time plaintiff reached the point of maximum recovery and the defendant had resisted further payments, there would have been a basis for the contention that defendant's action in discontinuing the payments was not arbitrary and unreasonable.
"This branch of the Court does not look with favor upon penalties against a person because he asserts a legal right without success, nevertheless, I am compelled by the law and the evidence in this record to assess the penalties provided by Act 310 of 1910; therefore, plaintiff is entitled to double the amount of the monthly benefits of $25.00, plus $150.00 attorneys' fees. In the event the case is appealed, plaintiff will be entitled to request the Appellate Court to fix an additional amount for the services of plaintiff's attorney in that Court."
We also are of the opinion that the attorneys' fee should be increased to $250.
Defendant had the case removed to the United States District Court which compelled plaintiff's counsel to take steps necessary to have it remanded to the District Court of Caddo Parish. This required services in excess of those usually rendered in a case of this character. Mr. Charles L. Mayer, prominent attorney of the Shreveport Bar, who has had extensive experience in prosecuting and defending suits of this and similar nature, testified that a fee of $250 for all services rendered by counsel of plaintiff was reasonable. Our own knowledge of such matters impels us to the same opinion. *Page 923 
For the reasons herein assigned, the judgment appealed from is amended by increasing the amount of attorneys' fee to $250, and in all other respects, said judgment is affirmed, with costs.